UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| UNITED STATES OF AMERICA | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:17-cr-00089-JAW |
| | ) | |
| IULIAN PETRE, a/k/a JULIAN PETRE | ) ) | |

**ORDER ON MOTION IN LIMINE**

With trial looming, the Court denies the Defendant's motion in limine insofar as he seeks a ruling that the Government may not admit evidence that in 2007, he questioned government officials about the laws and regulations applicable to the exporting of firearms from the United States to Romania and was informed by law enforcement what laws and regulations would be applicable. However, the Court defers ruling on whether evidence that the Defendant attempted to smuggle firearms to Romania in 2007 will be admissible as evidence to prove that he did so successfully in 2012. Finally, the Court concludes that evidence that the Defendant confessed to shipping three firearms to a person in Romania between September and November 2012 would likely be admissible without reference to the fact that the firearms were the same firearms the Defendant attempted to export in 2007.

**I.     BACKGROUND**

   **A.     Procedural History**

On June 20, 2017, a federal grand jury issued a seventeen count indictment against Iulian Petre for ten counts of receipt of a firearm in interstate commerce,

1

alleged violations of 18 U.S.C. § 924(b), three counts of shipment of a firearm in foreign commerce, alleged violations of 18 U.S.C. § 924(b), three counts of promotion money laundering, alleged violations of 18 U.S.C. § 1956(a)(2), and one count of smuggling, an alleged violation of 18 U.S.C. § 554. *Indictment* (ECF No. 23). On July 12, 2017, a federal grand jury issued a second seventeen count indictment against Mr. Petre. *Superseding Indictment* (ECF No. 32). On July 13, 2017, the Court set the matter for jury trial with jury selection occurring on August 21, 2017 and trial to follow immediately thereafter. *Notice of Hr'g* (ECF No. 39). On August 9, 2017, a federal grand jury issued a second, seventeen count superseding indictment. *Second Superseding Indictment* (ECF No. 63). On August 10, 2017, the Government moved to dismiss Count IX of the Second Superseding Indictment and on the same day, the Court granted the Government's motion, leaving sixteen counts pending against Mr. Petre. *Gov't's Unopposed Mot. to Dismiss Count Nine* (ECF No. 62); *Order* (ECF No. 66).

On August 1, 2017, Mr. Petre filed a motion in limine for a ruling to prohibit the Government from introducing evidence of his prior bad acts. *Mot. in Limine for a Ruling Prohibiting the Gov't from Introducing Alleged Prior Bad Acts in Violation of Fed. R. of Evid. 404(b) and 403* (ECF No. 46) (*Def.'s Mot.*). On August 7, 2017, the Government filed a response. *Gov't's Resp. to the Defense Mot. in Limine Regarding Prior Acts of the Def.* (ECF No. 56) (*Gov't's Opp'n*). Mr. Petre elected not to reply to the Government's response.

B.  **Factual Background**

### 1. The Second Superseding Indictment and the Government's Trial Brief

The second superseding indictment in this case alleges that Mr. Petre violated the federal firearms law that prohibits the receipt of a firearm that had been shipped from one state to another with the purpose of committing another federal offense. *Second Superseding Indictment* at 1–2 (ECF No. 63). The other federal offenses, according to the indictment, are the unauthorized export of arms and smuggling. *Id.* at 1. In its trial brief, the Government explains that Mr. Petre purchased firearms from the online auction site, Gunbroker.com, and directed that the firearms be shipped from outside the state of Maine to the address of a friend within the state of Maine with the intention of exporting the firearms to Romania without the necessary federal licenses. *Gov't's Trial Br.* at 2–3 (ECF No. 59).

Next, the second superseding indictment alleges that Mr. Petre violated the federal firearms law that prohibits the shipment of a firearm in foreign commerce with the purpose of committing another felony offense. *Second Superseding Indictment* at 2–3. The Government's trial brief states that after he received them in Maine, Mr. Petre shipped three rifles to Romania without the necessary governmental permits in violation of federal law. *Gov't's Trial Br.* at 4.

Thirdly, the second superseding indictment alleges that Mr. Petre violated the federal prohibition against money laundering. *Second Superseding Indictment* at 4–5. The Government's trial brief says that Mr. Petre provided his bank account information to persons in Romania and received funds in his Maine-based bank

3

account in order to export the firearms to Romania without proper licenses. *Gov't's Trial Br.* at 4.

Finally, the second superseding indictment alleges that by exporting firearms and receiving payment, Mr. Petre engaged in smuggling in violation of federal criminal law. *Second Superseding Indictment* at 5. The Government's trial brief contends that by exporting these firearms to Romania without proper permission, Mr. Petre engaged in smuggling. *Gov't's Trial Br.* at 4–5.

### 2. The 2007-08 Incident

The second superseding indictment alleges that Mr. Petre committed each of these crimes between August 27, 2012 and August 17, 2013. *Second Superseding Indictment* at 1–5. However, in its trial brief, the Government alludes to an incident that took place in 2007:

> This conduct involved not only the firearms described in Counts 1 through 13, but also others, including the three firearms he attempted to export in 2007 and did, by his own admission, export successfully in 2012.

*Gov't's Trial Br.* at 4–5.

In response to Mr. Petre's motion in limine, the Government explained the background underlying the 2007 incident, which spilled over into 2008. *Gov't's Opp'n* at 2–7. It seems that in November 2007, Mr. Petre called the Portland Maine office of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) and inquired about obtaining a license to ship firearms outside the country. *Id.* at 2. Mr. Petre told Special Agent Paul McNeil of ATF that he had shipped a number of shotguns to Romania over the past year but he wanted to ship rifles, and that the Postal Service

4

had said that he needed some type of license. *Id.* Agent McNeil told Mr. Petre about the legal requirements for export from the Department of State and the Department of Commerce. *Id.* Agent McNeil also told Mr. Petre that he would need to become a federally-licensed firearms (FFL) dealer because it appeared that he was in the business of selling firearms. *Id.* Agent McNeil told him to cease all firearms shipments until it was determined whether he needed a FFL. *Id.*

Agent McNeil together with Special Agent Douglas Kirk interviewed Mr. Petre again on December 4, 2007. *Id.* at 3. Mr. Petre told the agents that he had begun shipping firearms to Romania in 2006 and had sent about twenty firearms in the two months preceding the interview. *Id.* He said that he had gone to Romania twice the previous year and had brought cash back in exchange for the weapons. *Id.* Agents McNeil and Kirk told Mr. Petre that he seemed to be engaging in business as a firearms dealer and that he needed a FFL. *Id.* They also told Mr. Petre that he would need approval from the Departments of State and Commerce. *Id.* Mr. Petre responded that the business was lucrative enough for him to obtain the required licenses and he would fill out the necessary paperwork. *Id.* at 4. When Mr. Petre said that he intended to travel to Romania in two days, the agents emphasized that he must not transport any firearms with him to Romania without the required approvals. *Id.*

On December 6, 2007, Mr. Petre attempted to board a flight at Logan International Airport en route to Romania, but when his checked luggage was searched, the authorities found three handguns. *Id.* The firearms were a Beretta .40

caliber, an H&K .45 caliber, and a Colt .45 caliber. *Id.* at 6. Mr. Petre admitted that the firearms were going to be permanently removed from the United States, that he had bought them for a friend in Romania, and that he intended to deliver them. *Id.* at 4. The agents told him that he could not remove the pistols from the United States without export licenses and they detained his checked luggage. *Id.*

On December 10, 2007, Mr. Petre called Agent McNeil and said that he had run into a problem on his outbound flight from Logan the previous Tuesday and three pistols that he had purchased at the Kittery Trading Post were seized. *Id.*

On January 28, 2008, Agent McNeil, Special Agent Gary Moulton of Immigration and Customs Enforcement, and Special Agent Michael Imbrogna of the Department of Commerce interviewed Mr. Petre. *Id.* at 5. Mr. Petre told the agents that he had been shipping firearms to Romania since approximately 2007, that for the first six years, he had shipped six or seven firearms per year, but that in 2007, he had shipped about thirty. *Id.* Mr. Petre explained that friends from Romania would contact him for specific firearms and that he would purchase them, fronting the money, and ship them to Romania. *Id.* He would be paid when he traveled to Romania. *Id.* Sometimes he would bring the cash with him and other times, he would wire money from Romania to avoid the currency reporting requirements. *Id.* He said he had tried to take the three firearms with him to Romania because he had promised delivery and did not want to wait for approval. *Id.*

C. **The Government's Proffered Testimony**

6

At trial, the Government anticipates calling Agents McNeil and Moulton as witnesses to confirm what has just been outlined. *Id.* at 2–5. In addition, the Government intends to call Officer Alan Winstanley, the Customs and Border Patrol officer, who searched Mr. Petre's luggage at Logan, who seized the three firearms, and who recorded their serial numbers. *Id.* at 6. The Government also plans to call Eric Herlgerson of the Kittery Trading Post, where Mr. Petre purchased these three firearms, to testify about the sales to Mr. Petre. *Id.*

Finally, the Government seeks to admit the testimony of three additional federal agents to whom Mr. Petre admitted that between September and November 2012, he shipped the three firearms found in his luggage on December 6, 2007 to Alexandru Tamaianu in Bucharest, Romania. *Id.* at 6. Through these agents, the Government would introduce ATF documents that confirm Mr. Petre's admissions. *Id.*

## II. THE PARTIES' POSITIONS

### A. Iulian Petre's Position

Mr. Petre objects to the admission of any evidence about his interactions with Government agents in 2007-08, including his attempt to export firearms in December 2007. *Def.'s Mot.* at 1–4. Mr. Petre views the evidence as being potentially admissible only under Federal Rule of Evidence 404(b) as a prior bad act. *Id.* Mr. Petre reviews the standards for the admissibility of Rule 404(b) evidence and concludes that the proffered evidence would not be admissible because, in his view, the "sole purpose for introduction of this information would be to attempt to demonstrate a criminal

7

propensity." *Id.* at 3. Mr. Petre reviews the two-part analysis necessary for the admission of Rule 404(b) evidence under First Circuit authority. *Id.* at 1–2. The first step is to determine whether the Rule 404(b) evidence has "special relevance" for a purpose apart from propensity. *Id.* If the evidence survives the first step, the Court must still consider whether the evidence is admissible under Rule 403. *Id.* at 2.

Mr. Petre contends that there has been "almost ten years" between the two incidents and "that gap provides untenable grounds for arguing that the evidence establishes a common plan or scheme." *Id.* at 8. Also, he says that the 2007 incident "involved an alleged single, unsuccessful attempt to bring guns onto a plane, and in no way involved the mail." *Id.* Mr. Petre worries that the admission of this evidence would lead the jury to conclude that Mr. Petre has been "attempting to export guns improperly over the past decade", an inference that would be "highly prejudicial" to him. *Id.* at 4.

B. **The Government's Position**

The Government sees it differently. *Gov't's Opp'n* at 7–11. First, the Government does not view this 2007-08 evidence as Rule 404(b) evidence. *Id.* at 7–9. The Government argues that the "bulk of the evidence at issue is direct evidence of the charged offenses, and as such is not subject to F.R.E. 404(b) at all." *Id.* at 7. The Government contends that evidence that the agents informed Mr. Petre of the licensing requirements for the export of firearms "is not an act of the defendant, and is therefore has no[] relation to F.R.E. 404(b)." *Id.* at 8. Instead, it is "offered to show that the defendant had knowledge of the license requirements for firearms exports,

8

and that his activities in 2012 and 2013 therefore evinced the intent to willfully violate the law." *Id.*

Turning to the three handguns that Mr. Petre was alleged to have attempted to export in 2007, the Government says that he successfully exported those same three pistols between September and November 2012. *Id.* at 8. Observing that the indictment alleges that Mr. Petre engaged in smuggling between August 2012 and August 2013, the Government contends that the 2007-08 incident is direct evidence of Mr. Petre's course of conduct in committing the smuggling offense. *Id.* The Government claims that the 2007-08 evidence is also admissible under Rule 404(b) to demonstrate Mr. Petre's "motive, opportunity, knowledge, intent, preparation, plan . . . and absence of mistake or fact." *Id.* at 9–10.

## III. DISCUSSION

### A. Lessons on the Law

To analyze the admissibility of the 2007-08 events, the Court first distinguishes between what the federal officials told Mr. Petre about the law and the circumstances surrounding his 2007 attempt to smuggle handguns out of the United States. To prove a violation of 18 U.S.C. § 554(a) as alleged in Count Seventeen, the Government is required to demonstrate that the defendant "fraudulently or knowingly export[ed] or [sent] from the United States . . . any merchandise, article, or object contrary to any law or regulation of the United States." *United States v. Edouard*, No. 15-13218, 647 F. App'x. 984, 985 (11th Cir. Apr. 12, 2016) (quoting 18 U.S.C. § 554(a)).

9

Here, the second superseding indictment alleges that Mr. Petre fraudulently and knowingly exported three firearms "contrary to the laws and regulations of the United States, namely Title 22, United States Code, Sections 2778(b)(2) and 2778(c), Title 22, Code of Federal Regulations, Sections 121.1, 123.1, 123.22, and 127.1." *Second Superseding Indictment* at 5. Section 2778(b)(2) of title 22 prohibits the export of "defense articles or defense services designated by the President" under the statute. The cited portions of the Code of Federal Regulations describe "The United States Munitions List" and a list of firearms covered by that list, 22 C.F.R. § 121.1, the requirement for an export license, 22 C.F.R. § 123.1, mandatory electronic reporting of export information, 22 C.F.R. § 123.22, and violations that flow from failing to comply with the regulations. 22 C.F.R. § 127.1.

"[T]he general rule that ignorance of the law or a mistake of law is not defense to criminal prosecution is deeply rooted in the American legal system." *Commil USA, LLC v. Cisco. Sys.*, 135 S. Ct. 1920, 1930 (2015) (quoting *Cheek v. United States*, 498 U.S. 192, 199 (1991)). Even so, in cases involving "highly technical statutes that threatened to ensnare individuals in apparently innocent conduct", the Supreme Court and the First Circuit have sometimes required that the government prove actual knowledge of the law. *Bryan v. United States*, 524 U.S. 184, 193–94 (1998); *United States v. Morosco*, 822 F.3d 1, 20 (1st Cir. 2016).

This principle is especially applicable where the government is required to prove that a defendant acted "willfully" in violating the criminal statute. In 1933, the Supreme Court observed that the term "willfully" "when used in a criminal

10

statute . . . generally means an act done with a bad purpose." *United States v. Murdock*, 290 U.S. 389, 394 (1933). In *Cheek*, the Supreme Court explained that the "standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.'" *Cheek*, 498 U.S. at 201. Here, the Government is required to prove that Mr. Petre acted "willfully" in a number of the crimes charged and therefore, the exception to the general principle that "ignorance of the law is no excuse" may not apply here. The proffered evidence that in 2007-08, Mr. Petre asked about and was instructed on the applicable laws and regulations would be admissible to prove his "voluntary, intentional violation of a known legal duty."

Even if § 554 and its regulations are not deemed "highly technical statutes", evidence that Mr. Petre asked about the laws and regulations concerning the export of firearms to Romania in 2007-08 and was expressly informed about the specific nature of those laws and regulations is probative to prove his state of knowledge in 2012-13 and directly buttresses the Government's claim here that he acted "fraudulently or knowingly" within the meaning of 18 U.S.C. § 554. The Court concludes that whatever else may be said about the events and conversations in 2007-08, the colloquy between law enforcement and Mr. Petre about the legality of firearms exports to Romania is admissible as direct evidence of a violation of 18 U.S.C. § 554.

### B. The Foiled Export Attempt

The Court turns to whether the Logan International Airport incident is similarly admissible. This is a much closer question. The Government says that the 2007 incident, when Mr. Petre stowed three firearms in his luggage on his way to

Romania and was found out by customs officials at Logan Airport, is direct evidence of his commission of the smuggling charge in Count Seventeen because it is part of the same course of conduct[1] and in any event is admissible under Federal Rule of Evidence 404(b).

### 1. Uncharged Course of Conduct Evidence

The Court is skeptical that uncharged conduct taking place five years prior to the charged criminal conduct would be admissible to prove that a defendant committed the charged crime. To support its argument, the Government cites *United States v. Diaz-Martinez*, 71 F.3d 946, 951 n.4 (1st Cir. 1995) and *United States v. David*, 940 F.2d 722, 737 (1st Cir. 1991). *Gov't's Opp'n* at 7–8.

The Court does not view either case as helpful. In *Diaz-Martinez*, the defendant was charged with possessing firearms with obliterated serial numbers and at trial the prosecutor produced evidence that there had been a shootout in a parking lot just before the defendant was found with firearms nearby while squatting in the bushes near the parking lot. 71 F.3d at 951. In *Diaz-Martinez*, the disputed evidence took place at nearly the same time and in the same vicinity as his possession, not five years earlier.

In *David*, the defendant was charged—among other things—with conspiring with others to distribute cocaine. 940 F.2d at 726. The drug trafficking conspiracy in *David* ran from 1986 through 1988. *Id.* at 731. In June 1987, one of the co-

---

[1] Mr. Petre did not anticipate the course of conduct issue in his motion, *Def.'s Mot.* at 1–4, and he elected not to file a reply so the Court has no guidance from defense counsel on the course of conduct question.

conspirators, a Mr. Filin, tried to steal a shipment of cocaine, an act that Mr. David did not appreciate, and he and some cohorts threatened Mr. Filin with a firearm and baseball bat while Mr. David questioned him. *Id*. at 732. Shortly thereafter, Mr. David had another violent encounter with Mr. Filin, who ultimately confessed to stealing the drugs. *Id.* In addition, Mr. David had a recorded conversation with Reuven Furer, a middleman between Mr. David and his Florida suppliers, in which arguably in an effort to intimidate Mr. Furer, Mr. David told Mr. Furer that Mr. Musa, a New York drug dealer, had been murdered. *Id.* On appeal, Mr. David challenged the admission of both the Filin intimidation and the Furer telephone call. *Id.* But the First Circuit easily concluded that this evidence was properly admitted as evidence of Mr. David's participation in a continuing criminal enterprise. *Id.* at 737.

These cases seem wholly inapposite to whether the Court should admit the contested evidence in this case. Neither *Diaz-Martinez* nor *David* involved events that took place five years before the criminal acts alleged in the indictment. Based on the caselaw the Government cited, the Court does not find that evidence of the uncharged events surrounding the Logan International Airport episode in 2007 may be admitted as part of a course of conduct to prove that Mr. Petre committed crimes in 2012-13.[2]

---

[2] There may be a better answer to this issue, but the Court is operating under considerable time constraints since trial is scheduled to start shortly. Furthermore, as noted earlier, the Defendant has not briefed the issue. The Court resolves that what the Government submitted for authority is unconvincing, and it is important that the Court issue this order in order to allow the parties to prepare properly for trial.

13

### 2. Rule 404(b) Evidence

If the evidence of the 2007 incident at Logan International Airport is not admissible as direct evidence, the question turns to whether it would be admissible under Federal Rule of Evidence 404(b). The First Circuit case of *United States v. Ford*, 839 F.3d 94 (1st Cir. 2016) raises serious questions as to whether the 2007 events are properly admissible under Rule 404(b). In *Ford*, the government charged James F. Ford with—among other things—engaging in a conspiracy to manufacture marijuana in Maine in 2011. *Id.* at 98. In 2011, law enforcement discovered a large marijuana grow operation located at Mr. Ford's Monroe, Maine residence. *Id.* As it turned out, this was not Mr. Ford's first residential marijuana grow operation. *Id.* at 101–02. In 2002, Massachusetts law enforcement had discovered three rooms in Mr. Ford's Wakefield, Massachusetts residence "devoted entirely to marijuana." *Id.* at 102. During the trial, the district court allowed a Massachusetts state trooper to testify to the details of the Massachusetts grow operation based on its conclusion that the evidence was relevant to Mr. Ford's "motive, opportunity, intent, preparation, plan, and knowledge." *Id.* at 101–02.

Although the First Circuit affirmed the verdict based on its conclusion that the admission of the Rule 404(b) evidence was harmless error, the *Ford* Court was doubtful whether the trial court should have admitted evidence of the earlier marijuana grow under Rule 404(b). *Id.* at 109–110. The First Circuit noted that Mr. Ford had not contested that he had actually grown marijuana in Maine, thereby lessening the special relevance of the evidence. *Id.* at 109. Next, the First Circuit

14

was concerned about the length of time from the earlier grow in 2002 and the Maine grow in 2011. *Id.* Having concluded that the probative value of the evidence was "significantly reduced," the *Ford* Court viewed the risk of unfair prejudice from the testimony about the Massachusetts operation to have been "high." *Id.* at 110. Finally, even though the trial court judge gave a limiting instruction about the Rule 404(b) evidence, the First Circuit wondered whether "the district court's limiting instructions were sufficient to curb its prejudicial effect." *Id.* The First Circuit characterized the prejudicial effect of the Rule 404(b) evidence as "the risk [ ] that the jury [would] use [ ] it to infer criminal propensity." *Id.*

Although the facts in the two cases differ, *Ford* adds a cautionary note in the First Circuit concerning the admissibility of Rule 404(b) evidence. Here, as in *Ford*, the risk is that a jury will conclude that because Mr. Petre attempted to smuggle guns to Romania in 2007, he has a criminal propensity to do it again in 2012. Here, it is difficult to predict what defenses Mr. Petre will posit at his upcoming trial. In *Ford*, the defendant conceded that he was growing marijuana through his counsel during the opening statement. As Mr. Petre's counsel has not yet given his opening statement, the Court cannot know whether he will make any concessions during trial that could be relevant to the admissibility of the Rule 404(b) evidence. Also, as in *Ford*, there is a temporal gap between the uncharged and charged conduct. Here, the uncharged conduct took place in 2007, and the charged conduct in 2012. In *Ford*, Mr. Ford was investigated for his Massachusetts operation in 2002 and he started his Maine operation as early as 2009, a gap of seven years. *Id.* at 100.

Finally, in *United States v. Henry*, 848 F.3d 1 (1st Cir. 2017), the First Circuit emphasized that a trial court should consider not only whether "the evidence has been offered to prove an issue that is in genuine dispute," but also whether "the evidentiary point can be made with other evidence that does not present a risk of unfair prejudice." *Id.* at 9. Here, the Court does not know pretrial whether the Government will produce other evidence that will undercut its need for evidence of the uncharged conduct in 2007.

### 3. Iulian Petre's Later Confession

Finally, in its motion, the Government mentions that Special Agents Thresher and Rauch of the Department of Commerce interviewed Mr. Petre at some point and he admitted that between September 2012 and November 2012, he shipped to Alexandru Tamaianu in Bucharest, Romania, the same three firearms he had in his luggage at Logan in 2007. *Gov't's Opp'n* at 6. The Court is unaware of any reason Mr. Petre's confession that he shipped three firearms to Romania as well as documentation as to how he came into possession of those firearms would be inadmissible. At the same time, the Court continues to view the Logan International Airport escapade of 2007 as unnecessary to introduce this confession.

## IV. CONCLUSION

The Court GRANTS in part and DEFERS ruling in part on Iulian Petre's Motion in Limine for a Ruling Prohibiting the Gov't from Introducing Alleged Prior Bad Acts in Violation of Federal Rule of Evidence 404(b) and 403 (ECF No. 46). The Court rules that the Government may admit evidence that in 2007 and 2008, Mr.

Petre asked law enforcement about the laws and regulations applicable to shipping firearms from the United States to Romania and may admit evidence of law enforcement's responses. The Court also rules that the Government may introduce evidence of Iulian Petre's admission that he shipped three firearms to Alexandru Tamaianu in Bucharest, Romania, between September and November 2012 without reference to the Logan International Airport incident of 2007. However, the Court DEFERS ruling on whether the circumstances surrounding Mr. Petre's Logan International Airport encounter with law enforcement may be admissible. Before seeking to admit such evidence, the federal prosecutor must approach the bench and alert the Court and defense counsel that he intends to present the 2007 evidence so that the Court may hear argument and issue a final ruling.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 17th day of August, 2017